UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

In re:                                                    Chapter 11

           ONEIDA LTD.,                    Case No. 06-10489 (ALG)

                Reorganized Debtor.


-----------------------------------------------------------------x

ONEIDA LTD.,

                Plaintiff,                    Adv. Proc. No. 06-01920 (ALG)

       - against -

PENSION BENEFIT GUARANTY
CORPORATION,

                Defendant.
-----------------------------------------------------------------x

## MEMORANDUM OF OPINION

A P P E A R A N C E S :

SHEARMAN & STERLING LLP
Attorneys for Plaintiff
       By:    William J.F. Roll, III, Esq.
               Douglas P. Bartner, Esq.
               Lynette C. Kelly, Esq.
               Michael H. Torkin, Esq.
599 Lexington Avenue
New York, New York 10022

PENSION BENEFIT GUARANTY CORP.
Office of the Chief Counsel
        By:    Israel Goldowitz, Esq.
               Karen L. Morris, Esq.
               James L. Eggeman, Esq.
               Paula J. Connelly, Esq.
               Lawrence F. Landgraff, Esq.
               Erika E. Barnes, Esq.
1200 K Street, N.W.
Washington, D.C. 20005

STEPTOE & JOHNSON LLP
Attorneys for Defendant
        By:    Greg R. Yates, Esq.
               Charles G. Cole, Esq.
750 Seventh Avenue, Suite 1900
New York, New York 10019


**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**


On February 8, 2006, the President signed the Deficit Reduction Act of 2005

("DRA"), an appropriations bill designed to reduce the deficit in connection with the

2006 fiscal-year budget.  One section of this legislation (the "DRA Amendment")

amended the Employee Retirement Income Security Act of 1974 ("ERISA") to create an

additional premium for pension plans terminated as part of an in- or out-of-court

restructuring.  The premium ("DRA Premium") was payable to the Pension Benefit

Guaranty Corporation ("PBGC"), a private governmental corporation that was

established to collect premiums from pension plan sponsors and to insure certain plan

payments.

Oneida Ltd. ("Oneida" or "Debtor") and several affiliates filed petitions under

Chapter 11 of the Bankruptcy Code on March 19, 2006, a few weeks after passage of the

DRA.  Having confirmed a Plan of Reorganization on August 30, 2006 (the "Plan"),

Oneida commenced this declaratory judgment action, seeking a finding that the DRA Premiums are prepetition "claims" discharged by the Plan. The PBGC argues that DRA Premiums are not "claims" in the Chapter 11 case and were not discharged; alternatively, it contends that the Debtor is estopped from refusing to pay the DRA Premiums in full. For the reasons set forth below, the Court finds that the DRA Premiums are prepetition "claims" that were discharged in the Plan and that there is no occasion to apply the doctrine of estoppel against the Debtor.

## BACKGROUND

Oneida was formed in 1880 in Oneida, New York and became a leading designer and manufacturer of flatware. Facing challenges from overseas manufacturers, Oneida transitioned its operations from manufacturing and became wholly outsourced, with a focus on design and distribution. In 2004, it completed an out-of-court restructuring. Its senior lenders agreed to exchange their secured debt for 62% of Oneida's common stock and entered into a new credit agreement, which provided for approximately $235 million in new loans secured by first priority liens on nearly all of Oneida's assets. (Second Amended Disclosure Statement ("Disc. St."), ECF# 245, p. 15.)[1] In the Debtor's view, however, the 2004 restructuring "did not appropriately recapitalize the Company." (Disc. St., p. 18.) On March 19, 2006, Oneida and several subsidiaries filed bankruptcy petitions, along with a proposed disclosure statement and pre-negotiated plan of reorganization.

The Debtor's proposed plan and disclosure statement were based on the premise that Oneida was insolvent and that application of the bankruptcy priorities would leave

---

[1] References to ECF numbers are to the docket in the main case, Case No. 06-10489 (ALG), not the separate docket for this adversary proceeding.

no value for its unsecured creditors or for its old equity. However, at the time of the

filing, it appeared that Oneida had virtually no unsecured debt other than a substantial

potential obligation to the PBGC. It had also come to an agreement with the PBGC

relating to its pension obligations and the secured and unsecured liabilities resulting from

the underfunding of its three tax-qualified single-employer defined-benefit pension

plans—the Oneida Plan, the Buffalo China Salaried Plan, and the Buffalo China Union

Plan. These plans were underfunded by about $40 million, triggering minimum

contributions to fund the deficiency. There was never a dispute that, in Oneida's words,

"unless the Oneida Pension Plans [were] terminated, those minimum contribution

obligations would subsume all or virtually all of the Debtors' projected cash flow . . ."

(Disc. St., p. 21.) Accordingly, Oneida and the PBGC had negotiated over the pension

obligations and in an agreement that the parties never disavowed, Oneida had agreed to

provide the PBGC with a promissory note in the principal amount of $3 million for the

PBGC's secured claim; this note also covered "any unsecured claim it would have arising

out of the distress termination of certain of the Debtors' pension plans." *In re Oneida,*

*Ltd.*, 351 B.R. 79, 82 (Bankr. S.D.N.Y. 2006).[2]

The Debtor's agreement to provide the PBGC with a $3 million note was

premised on termination of all three pension plans. On the petition date, Oneida filed a

motion for an order finding that it had satisfied the financial requirements for distress

termination of these plans, as set forth in 29 U.S.C. § 1341(c)(2)(B)(ii)(IV), and

approving termination of the plans. After further negotiations between the Debtor and

---

[2] References are to the Court's opinion on confirmation of the Oneida Plan. During the contested
confirmation hearing, the PBGC's unsecured claims were valued by stipulation at $21,075,050, but the
Debtors and the PBGC "asserted the claim could be as high as $56,237,000." *Oneida*, 351 B.R. at 82. The
PBGC's secured claim was based on the liens that the PBGC had obtained prepetition for earlier missed
minimum funding contributions and was valued at approximately $2.7 million.

the PBGC, on April 27, 2006, the application was withdrawn for the Buffalo China

Salaried and Union Plans.  These plans were not terminated, although the Debtors

reserved the right to move to do so in the future.  On May 2, 2006, the Court entered an

order granting the Debtor's uncontested motion to terminate the Oneida Plan.

The PBGC and Oneida thereafter reached an agreement, dated May 3, 2006,

containing the specifics of the PBGC's claims arising from termination of the Oneida

pension plan, in effect finalizing their prepetition agreement, and the Debtor filed a

motion under Bankruptcy Rule 9019 for court approval thereof.  The settlement

agreement continued to provide the PBGC with a $3 million note.  It was also agreed that

"nothing contained [in the Settlement Agreement] or in the Plan of Reorganization will

be deemed to: (i) prejudice, preclude or otherwise affect any rights or obligations any of

the Parties may have in connection with any premiums arising under Section 8101 of the

Deficit Reduction Act of 2005 . . ."  (Settlement Agreement, ECF# 211, Exh. A.)  The

Settlement Agreement was never formally approved because of the objection of an

Equity Committee that had appeared in the case and objected to that part of the settlement

that recited that the PBGC had a $56,236,900 unsecured claim.  (Objection of Equity

Comm., ECF# 300.)  The Equity Committee, claiming there was value for equity, argued

that it was unfairly shut out and that an unreasonably high unsecured claim allocated to

the PBGC would prejudice its position.

There were continuing disputes as to the amount of the PBGC claim.[3]  Eventually,

all parties stipulated that the claim was *at least* $21,075,050.  (ECF# 342.)  In any event,

after a contested confirmation hearing in late July 2006, the Court found that there was no

---

[3] For example, the Debtors filed an expert report on June 9, 2006, that opined that the PBGC Termination
Claim aggregated $49,965,000.  ECF# 273.

value for equity, that the Plan satisfied the absolute priority provisions of the Bankruptcy

Code and that it could be "crammed down" against the equity.[4]  *Oneida*, 351 B.R. at 94.

The plan was confirmed by order dated August 30, 2006 and became effective on

September 15, 2006.

After confirmation, the Debtor and the PBGC entered into another stipulation,

approved by the Court following a hearing on October 26, 2006, relating to claims arising

from termination of the Oneida Pension Plan.  The order (ECF# 443) had a specific

provision relating to the PBGC's claims under the Deficit Reduction Act of 2005, stating:

> ¶ 5.  Nothing contained in this Stipulation, the Disclosure
> Statement (or any supplements thereto), the Plan of
> Reorganization (or any supplements thereto), and the
> Confirmation Order, shall prejudice, preclude or otherwise
> affect any rights, obligations or arguments Oneida or the
> PBGC may have to challenge or enforce the validity of the
> DRA Provision, including, without limitation, the
> requirement to pay the DRA Premiums.

Shortly after the Court entered the October 26th order, the Debtor commenced

this declaratory action, seeking a finding that the DRA Premiums are prepetition claims

that were satisfied, along with all other PBGC claims, by the $3 million note and were

otherwise discharged in Oneida's Plan.  The PBGC contended that the DRA Premiums

were not "claims" and accordingly were not discharged at confirmation.  The parties

nevertheless agreed that the DRA premiums would be paid into an escrow account while

the issue was litigated.  The PBGC also moved in the District Court to withdraw the

reference, on the premise (i) that this case required "consideration of both title 11 and

other laws of the United States regulating organizations or activities affecting interstate

---

[4] The PBGC appeared throughout the confirmation process.  The PBGC also made it clear that its
agreement to accept a $3 million note and no specific distribution on its unsecured claim only applied to the
pre-negotiated plan and could not be transposed to a plan that provided value to a junior class, the equity.

commerce" (mandatory withdrawal) or, alternatively, (ii) on the basis of discretionary

withdrawal of the reference.  *See* 28 U.S.C. § 157(d).  In a decision dated July 18, 2007,

the District Court declined to withdraw the reference, finding that to resolve the dispute,

"the Bankruptcy Court will be required to do what it does on a routine basis:  determine

whether the DRA Premiums are post-petition obligations that must be paid by Oneida

upon reorganization, or pre-petition 'claims' that may be discharged pursuant to the Plan

of Reorganization."  *Oneida Ltd. v. Pension Ben. Guar. Corp.*, 372 B.R. 107, 111

(S.D.N.Y. 2007).  It is to this determination that the Court now turns.

## **DISCUSSION**

Both parties have moved for summary judgment.  In accordance with Bankruptcy

Rule 7056, which incorporates Fed.R.Civ.P. 56, summary judgment may be granted "if

the pleadings, depositions, answers to interrogatories and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c); *see*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Morenz v. Wilson-Coker*, 415 F.3d

230, 234 (2d Cir. 2005).  The fact that both parties have moved for summary judgment

does not establish that there are no material facts in dispute.  *See Morales v. Quintel*

*Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001); *MG Ref. & Mktg., Inc. v. Knight Enters.*,

25 F.Supp.2d 175, 180 (S.D.N.Y. 1998).  However, the record before the Court reveals

no disputed issue of material fact.

Oneida argues that DRA Premiums are "claims" as defined in § 101(5) of the

Bankruptcy Code, and were therefore discharged by its Reorganization Plan pursuant to

11 U.S.C. § 1141.[5]  The PBGC argues that DRA Premiums are not "claims" under the

Bankruptcy Code and were not discharged.  The PBGC also argues, for the first time, that

the Court should estop the Debtor from claiming that the DRA Premiums were

discharged as a consequence of representations made by Oneida's Chief Financial Officer

at the confirmation hearing.  The Court will consider each of these arguments in turn.

## I.  The Treatment of DRA Premiums under the Bankruptcy Code

As the District Court found in its opinion refusing to withdraw the reference, "In

2006, facing a severe deficit in PBGC's funds, Congress passed the Deficit Reduction

Act of 2005, which, among other things, amended ERISA to add a premium (the "DRA

Premium") to be paid by companies that terminate covered pension plans (the "DRA

Amendment")."  372 B.R. at 108.  Codified at 29 U.S.C. § 1306(a)(7), the DRA

Amendment creates a special premium for pension plans terminated by companies in

reorganization proceedings.  The first part of the DRA Amendment reads, in relevant

part:

(A) In general

If there is a termination of a single-employer plan under
clause (ii) or (iii) of section 1341(c)(2)(B) of this title or
section 1342 of this title, there shall be payable to the
[PBGC], with respect to each applicable 12-month period, a
premium at a rate equal to $1,250 multiplied by the number
of individuals who were participants in the plan
immediately before the termination date.  Such premium
shall be in addition to any other premium under this
section.

---

[5] By the Plan's terms, on the effective date (September 15, 2006), "Specified Unsecured Claims will be
discharged and each Holder thereof shall not receive any distribution or property on account of its
Specified Unsecured Claim."  (Plan, ECF# 329, § 3.3(g)(i).)  The term "Specified Unsecured Claim" is
defined to include the aggregate of the "Unsecured PBGC Claims."  (Plan, § 1.1.)  The term "Unsecured
PBGC Claims" "means the aggregate amount owed to the PBGC in connection with the distressed
termination of the Pension Plans including pursuant to 29 U.S.C. §§ 1341(c)(2)(B)(ii), as amended . . ."
(Plan, § 1.1.)  Other sections of the Plan allocate the PBGC a $3 million Note for its secured claims.  (Plan,
§§ 3.3, 1.1.)

Clause (ii) of § 1341(c)(2)(B), referenced in § 1306(a)(7)(A), refers to companies that

reorganize in court, either under the Bankruptcy Code or analogous State law relating to

insolvency, and clause (iii) refers to out-of-court restructurings.  Section 1342, which is

also cross-referenced, authorizes the PBGC to terminate a pension plan on its own

initiative.

Subsection (B) of the DRA Amendment then creates a rule that applies only in

reorganization cases under bankruptcy law.  It reads in full:

(B) Special rule for plans terminated in bankruptcy reorganization

> In the case of a single-employer plan terminated under
> section 1341(c)(2)(B)(ii) of this title or under section 1342
> of this title during pendency of any bankruptcy
> reorganization proceeding under chapter 11 of Title 11, or
> under any similar law of a State or a political subdivision of
> a State (or a case described in section 1341(c)(2)(B)(i) of
> this title filed by or against such person has been converted,
> as of such date, to such a case in which reorganization is
> sought), subparagraph (A) shall not apply to such plan until
> the date of the discharge or dismissal of such person in
> such case.

Subsection (C) defines the term "applicable 12-month period" differently for in- and out-

of-court reorganizations as follows:

(C) Applicable 12-month period

> For purposes of subparagraph (A)—

> (i)    In general

> The term "applicable 12-month period" means—

>> (I) the 12-month period beginning with the first
>> month following the month in which the
>> termination date occurs, and

(II) each of the first two 12-month periods immediately following the period described in subclause (I).

(ii) Plans terminated in bankruptcy reorganization

In any case in which the requirements of subparagraph (B) are met in connection with the termination of the plan with respect to 1 or more persons described in such subparagraph, the 12-month period described in clause (i)(I) shall be the 12-month period beginning with the first month following the month which includes the earliest date as of which each such person is discharged or dismissed in the case described in such clause in connection with such person.

The plain words of the statute demonstrate the following. First, under subsection (A), whenever an employer terminates a single-employer plan under ERISA's distress termination provisions in connection with a reorganization, whether inside or outside of bankruptcy, it is liable for a special DRA Premium calculated as of the termination date. Second, under subsection (B), when termination takes place in a Chapter 11 proceeding or an analogous proceeding under State law, the obligation to pay the DRA Premium is deemed to arise upon the date of discharge, which is usually the effective date of the plan of reorganization.[6] Third, under subsection (C), the DRA Premium is due at different times for cases in and out-of-court. For cases out-of-court, the Premium is due following the month after pension plan termination; for cases in-court, the Premium is due following the month after discharge.

---

[6] Discharge in a Chapter 11 reorganization occurs upon entry of a Confirmation Order, "except as otherwise provided in this subsection, in the plan, or in the order confirming the plan." 11 U.S.C. § 1141(d)(1). In this case, the discharge was operative on the Effective Date of the Plan, September 15, 2006. Plan, § 12.3; Confirmation Order, ECF# 387, ¶ 40, 41.

**Is the DRA Premium a Claim?**

The principal question before the Court is whether the DRA Premium is a "claim" as defined in the Bankruptcy Code. Section 101(5)(A) of the Bankruptcy Code defines the term "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."[7] As the Supreme Court has repeatedly held, Congress intended the term "claim" to have "the broadest available definition." *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991); *see also FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 302-3 (2003); *Pennsylvania Dep't of Public Welfare v. Davenport*, 495 U.S. 552, 558 (1990).

The Second Circuit has also frequently described the term "claim" as expansive in scope, noting that the definition of "claim" in the Bankruptcy Code "replaced the far narrower concept of claim allowance established in the Bankruptcy Act of 1898." *In re Manville Forest Prods. Corp.*, 209 F.3d 125, 128 (2d Cir. 2000); *see also United States v. LTV Corp.* (*In re Chateaugay Corp.*), 944 F.2d 997, 1003 (2d Cir. 1991) (hereinafter "*Chateaugay I*"). The prior Bankruptcy Act provided that only "provable claims" could participate in the distribution of estate assets, and it thereby excluded liabilities of an uncertain and unliquidated nature. The philosophy of the 1978 Bankruptcy Code was to admit all possible liabilities and thereby treat creditors equitably as well as provide debtors with a more comprehensive discharge. *See Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 581 (S.D.N.Y. 2001) ("The Bankruptcy Code's more inclusive definition of a claim makes perfect sense in light of the Code's design to

---

[7] Section 101(5)(B) supplies a second definition of the term "claim" where the liability is based on an equitable remedy, but neither party in this case contends that the DRA Premiums give rise to an equitable remedy.

provide for a comprehensive discharge of liabilities so that the debtor may reorganize effectively.").

The "broadest available" definition of "claim" in § 101(5)(A) includes a right to payment that is "contingent" and "unmatured." "It is generally agreed that a debt is contingent if it does not become an obligation until the occurrence of a future event." *In re Mazzeo*, 131 F.3d 295, 303 (2d Cir. 1997). Thus, the fact that a right to payment is subject to one or more contingencies, such as a pension plan termination or a Chapter 11 discharge, does not remove the right to payment from the definition of "claim." As the Second Circuit has stated, by including the term "contingent" in the definition of a "claim," Congress "gave the term claim a broad definition and 'contemplate[d] that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case.'" *Chateaugay I*, 944 F.2d at 1003, quoting H.R. Rep. No. 95-595, at 309 (1978).

If there is a dispute relating to the allowance of a contingent claim, it may be necessary for the Court, as part of the process of valuing the claim, to determine the probability that the contingency will occur. Bankruptcy courts routinely perform this analysis in connection with the allowance or disallowance of claims. *See Matter of Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir. 1988) ("To value the contingent liability it is necessary to discount it by the probability that the contingency will occur and the liability become real."); 4 COLLIER ON BANKRUPTCY ¶ 502.03[1][a] (15th ed. rev. 2007). Indeed, the court has explicit power under § 502(c) of the Bankruptcy Code to estimate certain claims. *See O'Neill v. Continental Airlines, Inc.* (*Matter of Continental Airlines*), 981 F.2d 1450, 1461 (5th Cir. 1993) ("In order for the estimation process of §

502(c) to apply, a claim must be contingent or unliquidated and fixing the claim must entail undue delay in the administration of justice."). However, there can be no dispute that contingent claims are "claims" as defined in the Bankruptcy Code.

Under any construction of the term, the DRA Premium in a Chapter 11 case is a classic contingent claim. Where the pension plan is terminated in an out-of-court reorganization, the "claim" is fixed. Where the reorganization takes place in connection with a Chapter 11 case, it is contingent and becomes enforceable only after the debtor receives a discharge or the court case is dismissed. However, the DRA Amendment creates a liability to the PBGC—a claim—for all companies that effect a distress termination of a covered pension plan during a reorganization proceeding. It is only the "special rule" for in-court reorganizations that makes this claim contingent. In any event, there is not very much that is contingent about the DRA Premium liability in the Chapter 11 context. The statute provides that the claim *will* arise at the time the debtor obtains a discharge or at the time the case is dismissed—and one or the other of these must occur if a debtor has filed a petition under Chapter 11.[8] The only real uncertainty (contingency) is the number of workers who will be employed on the date for calculating the claim. Nevertheless, that amount can easily be estimated based on the facts of record at the time of the confirmation hearing or even later, as claim issues do not have to be resolved at the time of confirmation so long as plan feasibility is not implicated. *See In re Adelphia Bus. Solutions, Inc.*, 341 B.R. 415, 423 (Bankr. S.D.N.Y. 2003); *In re MacDonald*, 128 B.R. 161, 167-68 (Bankr. W.D. Tex. 1991).

---

[8] If a corporate debtor liquidates in Chapter 11, it does not obtain a discharge. 11 U.S.C. § 1141(d)(3)(A). However, in that case, it no longer undergoes a reorganization, there are no employees in the post-confirmation period, and the DRA Amendment does not appear to have any application at all.

Despite the fact that the DRA Premium bears all the indicia of a classic contingent claim in a Chapter 11 case, the PBGC argues that the DRA Premium is not a "claim" because the obligation to pay does not become enforceable prior to the effective date of a Chapter 11 discharge.  Because the definition of "claim" includes the words "unliquidated," "contingent," and "unmatured," a plain reading of § 101(5)(A) tells us that a "claim" includes a right to payment which is not presently enforceable.  It is well accepted that "a party may have a bankruptcy claim and not possess a cause of action on that claim."  *Kilbarr Corp. v. Gen. Servs. Admin. Office* (*In re Remington Rand Corp.*), 836 F.2d 825, 832 (3d Cir. 1988); *see also In re Cool Fuel, Inc.*, 210 F.3d 999, 1006 (9th Cir. 2000); 11 U.S.C. § 502(b)(1) (claim shall be allowed "except to the extent that . . . such claim is unenforceable against the debtor, under any agreement or applicable law for any reason *other than because such claim is contingent* or unmatured") (emphasis added).  Whether there is a right to payment under non-bankruptcy law does not answer the question whether there is a Bankruptcy Code "claim."  The PBGC is correct that non-bankruptcy law, in this case ERISA, governs issues such as the liquidated value of, enforceability of, or defenses to the right to payment.  Bankruptcy law, however, governs whether a claim exists under the Bankruptcy Code and if so, whether such claim arose pre- or post-petition.  As the Second Circuit has held, "Whether a claim exists is determined by bankruptcy law."  *Manville Forest*, 209 F.3d at 128.

Pension liabilities have frequently been held to be "claims" within the definition of the Bankruptcy Code.  *See Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 103-4 (2d Cir. 1986) (withdrawal liability is not an administrative expense but prepetition claim); *In re Art Shirt Ltd., Inc.*, 93 B.R. 333, 338 (E.D. Pa. 1988)

14

(withdrawal liability considered a debt for purposes of determining insolvency);

*Amalgamated Ins. Fund v. William B. Kessler, Inc.*, 55 B.R. 735, 738-40 (S.D.N.Y. 1985)

(withdrawal liability not an administrative expense because it accrued prior to filing for

bankruptcy); *In re Crane Rental Co, Inc.*, 334 B.R. 73, 76-77 (Bankr. D. Mass. 2005)

(withdrawal liability is a prepetition claim); *In re CD Realty Partners*, 205 B.R. 651, 659

(Bankr. D. Mass. 1997) (same); *In re Westmoreland Coal Co.*, 213 B.R. 1, 15 (Bankr. D.

Colo. 1997) (plan trustees hold an unmatured, unliquidated claim for future pre-funding

premiums); *In re Great Northeastern Lumber & Millwork Corp.*, 64 B.R. 426, 428

(Bankr. E.D. Pa. 1986) (withdrawal liability not entitled to administrative priority); *In re

Pulaski Highway Exp., Inc.*, 57 B.R. 502, 507 (Bankr. M.D. Tenn. 1986) (liability and

amount may be contingent and unliquidated, but "such uncertainties do not defeat the

existence of pre-petition claims for benefits which accrued prior to withdrawal"); *In re

Silver Wheel Freightlines, Inc.*, 57 B.R. 476, 478 (Bankr. D. Or. 1985) (withdrawal

liability contingent prepetition claim).

 *CPT Holdings v. Indust. & Allied Employees Union*, 162 F.3d 405 (6th Cir. 1998),

on which the PBGC relies, is distinguishable.  In that case, the debtor's plan was

confirmed in January 1993, but it did not terminate its pension plan obligations until over

a year later, in October 1994.  The debtor had made post-confirmation payments for some

time before withdrawing from the pension plans.  The Court noted that "if [debtors] want

their withdrawal liability discharged, they must completely withdraw from the plan prior

to confirmation." *Id.* at 409. *See also In re United Merchs. & Mfrs., Inc.*, 166 B.R. 234

(Bankr. D. Del. 1994), where there was no withdrawal before confirmation. In this case,

the pension plan was terminated prior to confirmation and liability accrued as a consequence.

The PBGC offers no authority for the proposition that the breadth of the term "claim" in the Bankruptcy Code can be limited by a provision that the claim does not arise until "after" the effective date of a plan.  Private parties could not accomplish this by a contractual provision that provided that damages would be payable only after a bankruptcy discharge.  Such a provision would permit parties to a contract to create a new priority for themselves and circumvent the provisions of the Bankruptcy Code by the simple expedient of providing that the debt did not accrue until after bankruptcy proceedings had terminated.  This type of provision would be a far more egregious version of the "springing lien" that is deemed to come into existence on a filing in bankruptcy and that was expressly banned by the Bankruptcy Code.[9]  Similarly, a State could not create a liability that was deferred until—or came into existence on—the effective date of a Chapter 11 plan.  Such a provision would permit any State to circumvent the discharge provided for in the Bankruptcy Code and effectively create a new priority—indeed, a new nondischargeable debt.  *See, e.g.*, *Int'l Brotherhood of Teamsters v. Kitty Hawk Int'l, Inc.* (*In re Kitty Hawk, Inc.*), 255 B.R. 428, 438-39 (Bankr. N.D. Tex. 2000).

Even though the Debtor raised the issue, the PBGC does not contend that Congress in effect granted it a new nondischargeable prepetition claim by virtue of the DRA Amendment.  Nor could it sustain such a contention, which would require the Court

---

[9] A "springing lien" is a provision that gives a creditor a priority right to payment on the occurrence of a condition such as the debtor's bankruptcy or insolvency.  Such provisions are barred by the Bankruptcy Code.  §§ 363(*l*), 541(c)(1)(B); *see Matter of Railway Reorganization Estate, Inc.*, 133 B.R. 574, 582-83 (Bankr. D. Del. 1991).

to find that Congress thereby repealed or amended the Bankruptcy Code.  There is a strong presumption that a later law does not impliedly repeal or amend an established law such as the Bankruptcy Code.  *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 127 S.Ct. 2518, 2532 (2007); *Morton v. Mancari*, 417 U.S. 535, 551 (1974).[10]  The presumption against implied amendment or repeal is even stronger where, as here, the potentially repealing measure was enacted in an appropriations bill.  *See United States v. Will*, 449 U.S. 200, 221-22 (1980); *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 190 (1978); *Auburn Housing Auth. v. Martinez*, 277 F.3d 138, 144 (2d Cir. 2002); *Calloway v. District of Columbia*, 216 F.3d 1, 9-10 (D.C. Cir. 2000).

The presumption against implied amendment or repeal can be overcome only under limited circumstances.  *Nat'l Ass'n of Home Builders*, 127 S.Ct. at 2532.  One ground is that there is an irreconcilable conflict between the earlier and later-enacted statutes.  *Id.*  The PBGC has made no effort to support the proposition that the DRA Amendment and the Bankruptcy Code are irreconcilable.  It cannot and does not argue that Congress left it with nothing if it is afforded a contingent unsecured claim for the DRA Premium.  Reconciliation of the statutes affords the PBGC an unsecured claim based on the contingent liability of the DRA Premiums.[11]  To adopt the PBGC's position, on the other hand, the Court would have to find that Congress amended the Bankruptcy

---

[10] This rule applies to statutes that would amend as well as repeal established law.  As the Supreme Court said in *Nat'l Ass'n of Home Builders*, 127 S.Ct. at 2533, n.8, "Every amendment of a statute effects a partial repeal to the extent that the new statutory command displaces earlier, inconsistent commands, and we have repeatedly recognized that implied amendments are no more favored than implied repeals."

[11] This liability was eliminated under the unique facts of the PBGC's express agreement in this case, but this happenstance, premised on Oneida's insolvency and the amount of debt owed to its secured creditors, does not establish that there is an irreconcilable conflict between the DRA Amendment and the Bankruptcy Code.

Code and created a new nondischargeable debt for the benefit of the PBGC by virtue of the DRA Amendment.

Nor does the PBGC contend that there exists a "clear and manifest" intent of Congress to amend the Bankruptcy Code. *Nat'l Ass'n of Home Builders*, 127 S.Ct. at 2532; *see also Morton*, 417 U.S. at 551; *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 134 (1974). No such intent is evident from the DRA Amendment; for example, there is no legislative directive to deny discharge of the DRA Premiums notwithstanding any other applicable law. *See Lockhart v. United States*, 546 U.S. 142, 149 (2005) (Scalia, J., concurring). There is no direction that the DRA Premium *not* be considered a claim under the Bankruptcy Code.[12]

In *PBGC v. CF&I Fabricators of Utah, Inc.* (*In re CF&I Fabricators of Utah*), 150 F.3d 1293 (10th Cir. 1998), *cert. denied*, 526 U.S. 1145 (1999), the question before the Court was whether the fact that an ERISA statute called a liability a "tax" was conclusive as to whether the exactment "must be treated as taxes and accorded tax priority under the Bankruptcy Code." 150 F.3d at 1296. The Court found that the language of the ERISA statute was not conclusive because it was not sufficiently "explicit" that Congress intended to amend the Bankruptcy Code and provide the PBGC with the priority afforded to tax claims. It cited the decision of the Supreme Court in *United States v. Reorganized CF&I Fabricators of Utah, Inc.* (*In re CF&I Fabricators*), 518 U.S. 213 (1996), and stated, "As we read the [Supreme] Court's analysis, the key to whether a statutory provision is 'explicit' in this context is whether the *Bankruptcy Code*

---

[12] Other bases for implied repeal exist but are inapplicable to this case. *See Branch v. Smith*, 538 U.S. 254, 274 (2003) (later act covers the whole substance of the earlier one and is "clearly intended as a substitute") (internal citation omitted); *McHugh v. Rubin*, 220 F.3d 53, 58 (2d Cir. 2000) (defunding suspends operation of a statute).

adopts and makes specific reference to the provisions of the other law." 150 F.3d at 1297

(emphasis in original).[13]  The DRA Amendment also fails the test of explicitness, as the

Bankruptcy Code does not adopt or make any reference to the DRA Premiums, despite

the fact that only a few months before the adoption of the DRA Amendment, Congress

had amended the Bankruptcy Code to create several new nondischargeable debts.[14]  *See*

*also Delta Air Lines, Inc. v. Bibb* (*In re Delta Air Lines*), 359 B.R. 454, 464 (Bankr.

S.D.N.Y. 2006), quoting 4 COLLIER ON BANKRUPTCY ¶ 507.02 at 507-19 (15th ed. rev.

2006) ("To the extent a federal non-bankruptcy statute purports to affect priorities within

a bankruptcy case, that statute is preempted by the more specific provisions in the

Code.").

        In *Chateaugay I*, the Second Circuit construed the bankruptcy term "claim" in the

context of a Comprehensive Environmental Response, Compensation and Liability Act

("CERCLA") claim for environmental cleanup costs.  In adopting a comprehensive

environmental cleanup statute, Congress had imposed certain costs on polluters but had

not purported to amend the Bankruptcy Code.  The Court said, in words equally

applicable here, "If the [Bankruptcy] Code, fairly construed, creates limits on the extent

of environmental cleanup efforts, the remedy is for Congress to make exceptions to the

---

[13] In *In re CF&I Fabricators*, 518 U.S. at 219-20, the Supreme Court took note of the fact that the Bankruptcy Code contains a number of specific provisions that establish the treatment in bankruptcy cases of liabilities arising under another Federal statute.

[14] The 109th Congress, 1st Session had amended the Bankruptcy Code in early 2005 in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA").  There, Congress created new exceptions to discharge in § 523(a)(5) (domestic support obligations), § 523(a)(14A) (obligation incurred to pay a nondischargeable tax), § 523(a)(14B) (fines or penalties incurred under Federal election law), and § 523(a)(18) (loan from an employee benefit fund).  Congress knew how to create an exception to discharge, and it could have amended the Bankruptcy Code when it passed the DRA but did not do so.  Moreover, there is a further presumption that statutes passed in the same legislative session should be interpreted, if at all possible, so that each is given effect.  *See Morf v. Bingaman*, 298 U.S. 407, 414 (1936); *Auburn Housing*, 277 F.3d at 145.

Code to achieve other objectives that Congress chooses to reach, rather than for courts to restrict the meaning of across-the-board legislation like a bankruptcy law in order to promote objectives evident in more focused statutes." *Chateaugay I*, 944 F.2d at 1002; *see also In re Revere Copper and Brass Inc.*, 172 B.R. 192, 197 (S.D.N.Y. 1994) (status of "claim" to be determined as "a matter of bankruptcy law . . . without reference to the policy concerns embodied in the CERCLA statute.").  The Supreme Court has also consistently held that "Any doubt concerning the appropriate characterization [of a claim] is best resolved in accordance with the Bankruptcy Code's equal distribution aim." *See Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 126 S.Ct. 2105, 2116 (2006); *see also Nathanson v. N.L.R.B.*, 344 U.S. 25, 29 (1952).  Under these circumstances, it is telling, if not conclusive, that the PBGC has not argued—and has not cited any authority in support of the proposition—that Congress did in fact amend the Bankruptcy Code by creating a new nondischargeable debt for its benefit or by limiting the scope of the term "claim."

**Did the Claim Arise Prepetition?**

A further question is whether the obligation to pay DRA Premiums—the "claim"—should be classified as pre- or post-petition.  Claimants with a prepetition claim possess a right to payment that arose prior to the filing of the bankruptcy petition.  *See Manville Forest*, 209 F.3d at 128, citing *LTV Steel v. Shalala* (*In re Chateaugay Corp.*), 53 F.3d 478, 497 (2d Cir. 1995) (hereinafter, "*Chateaugay II*").  The PBGC argues that because the liability became enforceable only after the distress termination of the pension plan, and because the distress termination in this case occurred post-petition, the liability is at worst a post-petition claim, entitled to be paid in full as an administrative expense of

the Chapter 11 case.  Oneida argues the "claim" is a prepetition claim because it existed as a contingent claim at the time Oneida filed its bankruptcy petition.

The Bankruptcy Code does not specify when a "contingent claim" arises.  The cases hold that "in the context of contract claims, the Code's inclusion of 'unmatured' and 'contingent' claims is usually said to refer to obligations that will become due upon the happening of a future event that was 'within the actual or presumed contemplation of the parties at the time the original relationship between the parties was created.'" *Chateaugay I*, 944 F.2d at 1004, citing *In re All Media Properties, Inc.*, 5 B.R. 126, 133 (Bankr. S.D. Tex. 1980), *aff'd mem.*, 646 F.2d 193 (5th Cir. 1981).  Under the law of this Circuit, an indemnification agreement, for example, gives rise to a contingent claim at the time the agreement is executed; if the parties had an indemnification agreement prepetition, then the right to compel indemnification is treated as a prepetition claim, even if the remedy only became available post-petition.  *See Manville Forest*, 209 F.3d at 129, citing *Houbigant, Inc. v. ABC Mercantile, Inc.* (*In re Houbigant, Inc.*), 188 B.R. 347, 358-59 (Bankr. S.D.N.Y. 1995); *see also Woburn Assocs. v. Kahn* (*In re Hemingway Transport, Inc.*), 954 F.2d 1, 9, n.9 (1st Cir. 1992).

Similarly, when a right to payment is created by a statutory obligation, the counterpart "claim" dates from the time of commencement of the relationship between the parties, not the date when the right to payment became enforceable.  The Second Circuit's decision in *Chateaugay I* is directly on point.  As noted above, the case addressed the statutory right of the Environmental Protection Agency ("EPA") to collect cleanup costs pursuant to CERCLA.  In that case, the EPA's claim was treated as a prepetition claim; the Court held that "the relationship between environmental regulating

21

agencies and those subject to regulation provides sufficient 'contemplation' of contingencies to bring most ultimately maturing payment obligations based on prepetition conduct within the definition of 'claims.'" *Id.* at 1005.

The PBGC relies on an entirely different *Chateaugay* case, but it is inapposite. In *Chateaugay II*, 53 F.3d at 484-86, the Circuit Court considered a right to payment created by a statute that was enacted years after the debtor had filed its bankruptcy petition. The new Coal Industry Retiree Health Benefit Act of 1992 ("Coal Act") required companies in the debtor's business to pay premiums into a pension fund for retired mine workers, and the debtor challenged its obligations thereunder, arguing that the premiums were prepetition claims that should be disallowed because a proof of claim had not been filed. The Second Circuit held that "no right to payment . . . existed until the enactment of the Coal Act six years after the filing of LTV's petition." *Id.* at 497. It held that the obligation to pay was a post-petition liability.

The *Chateaugay* cases demonstrate that in determining when a contingent claim arises, the critical factor is whether, at the time of the petition, the parties contemplated that the contingent obligation would exist if the contingency occurred. At one end of the spectrum is the relationship between a future tort claimant and tortfeasor; the other end is the relationship between parties to a bargained-for indemnification contract. *See Chateaugay I*, 944 F.2d at 1005. In the former situation, parties do not contemplate that any obligation might be owed; in fact, the identities of the parties are not known. In the latter case, the possibility that an obligation will become enforceable is expressly contemplated. Claims based on statutory obligations fall somewhere between these two

poles.  To the extent a right to payment created by statute is like an express contract entered into by parties prepetition, the liability will be deemed one arising prepetition.

In this case, all of the relevant facts militate toward a finding that the "claim" was in the parties' contemplation prior to the petition date.  First, the Deficit Reduction Act of 2005 was passed before Oneida filed its bankruptcy petition.  Second, there does not appear to be any question that the Debtor intended to terminate its pension plans. In this case, the PBGC and Debtor met at least twice prior to filing, "discussed effectuating a distress termination of the Oneida Pension Plans" (Disc. St., p. 22), and they had agreed to the PBGC's treatment in a Chapter 11 plan.  The parties had a prepetition relationship where it can fairly be said that the "claim" was within the parties' contemplation.[15]

Many of the cases cited above for the proposition that a pension obligation is a contingent claim in a bankruptcy case also involved the question whether the claim would be deemed a prepetition claim even though the contingency did not occur until after the filing of the petition.  *See Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d at 103; *In re Crane Rental*, 334 B.R. at 77; *In re CD Realty Partners*, 205 B.R. at 660; *In re Westmoreland Coal*, 213 B.R. at 15-16; *In re Pulasky Highway Exp.*, 57 B.R. at 508; *In re Silver Wheel Freightlines*, 57 B.R. at 479.  For reasons stated in the *McFarlin's* case, there are other grounds to find that the DRA Premiums are not administrative expenses, such as the fact that the consideration supporting the claimant's right to payment was not supplied and beneficial to the debtor in possession in the

---

[15] Further, the legislative history of the DRA Amendment indicates that Congress intended that potential debtors should contemplate the consequences of terminating their pension obligations in a bankruptcy case before they file.  *See* H.R. Rep. No. 109-276 at 347-48 (Nov. 7, 2005) ("[T]he Committee does believe that the plan sponsors that have not [yet] filed a petition for bankruptcy reorganization must take into account the cost of the termination premium . . . .").  If a potential debtor must "take into account the cost of the termination premium," then such an obligation would have to be in the contemplation of the debtor prior to filing its bankruptcy petition.

operation of the business. 789 F.2d at 101. In any event, for present purposes, the key

fact is that pension claims have been considered as prepetition claims except where the

plans were terminated after the debtor had confirmed its plan of reorganization.

Besides the "relationship and contemplation" test, courts sometimes apply a

"conduct" test to determine whether a claim is prepetition or post-petition. *See*, *e.g.*,

*Epstein v. Official Comm. of Unsecured Creditors* (*In re Piper Aircraft Corp.*), 58 F.3d

1573, 1576, n. 4 (11th Cir. 1995); *Grady v. A.H. Robins Co.*, 839 F.2d 198, 199 (4th Cir.

1988); *In re Johns-Manville Corp.*, 36 B.R. 743, 750 (Bankr. S.D.N.Y. 1986). Oneida

argues that under this test the PBGC possessed a prepetition claim because the "conduct"

on which the "claim" is grounded, its employees' work, was performed prepetition. The

Court is not persuaded; if any conduct triggered liability, it was the distress termination in

the bankruptcy case. Courts employing the conduct test tend to do so when the claim is

grounded in a tort or a conduct-related statutory obligation rather than a statutory

pension-funding obligation. *See In re CD Realty Partners*, 205 B.R. at 656. Even then,

the conduct test is primarily useful only to determine whether a prepetition relationship

recognized in tort law exists. *See In re Piper Aircraft*, 58 F.3d at 1577; *West v.

Worldcom, Inc.*, 2007 WL 3407060 at *3 (S.D.N.Y. Nov. 14, 2007).[16]

---

[16] Oneida also cites *PBGC. v. Skeen* (*In re Bayly Corp.*), 163 F.3d 1205 (10th Cir. 1998), for the proposition that withdrawal liability to the PBGC is a prepetition claim, based on the fact that the pension benefits were accrued prepetition. In *Bayly*, however, the PBGC's proofs of claim against the debtor were based on a funding deficiency under 29 U.S.C. § 1368(b), which gives the PBGC a claim for the amount of the unfunded benefit liabilities under 29 U.S.C. § 1362(b)(1)(A). In this case, the PGBC's DRA Premium claim is not for a prepetition deficiency in plan funding but is based on damages arising out of termination of the plan. The connection between the claim and prepetition labor in *Bayly*, where the PBGC's claim was "predicated solely on benefits accrued by Debtor's employees as a result of pre-petition labor," is not present here. *In re Bayly*, 163 F.3d at 1206.

Notwithstanding the lack of relevance of the "conduct" test, this "claim" was in the contemplation of both parties before the petition date and, for purposes of the Debtor's Chapter 11 case, arose prepetition.

## II.  Judicial Estoppel

The PBGC finally argues that even if the DRA Premiums are "claims" for purposes of the Oneida Reorganization Plan, the Debtor should be barred from discharging them under the doctrine of judicial estoppel.  The PBGC grounds its estoppel argument on the fact that at the Confirmation Hearing, the Debtor's chief financial officer included payment of the DRA Premiums in the Debtor's cash flow projections and never suggested that the Debtor might not pay them in full.  The Debtor, on the other hand, claims that its witness was being conservative in his projections, since Oneida might have to pay the Premiums in full and, in any event, would have to escrow an amount sufficient to cover the Premiums until the conclusion of litigation over an issue of first impression.

The doctrine of judicial estoppel serves to protect the "integrity of the judicial process" by "prohibiting parties from deliberately changing positions according to the exigencies of the moment."  *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001) (internal citations omitted).  The Supreme Court has identified three factors that warrant a finding of judicial estoppel—(i) a party's later position must be "clearly inconsistent" with its earlier position; (ii) the party must have successfully persuaded a court to adopt its earlier position, and adoption of the second, inconsistent position would "create the perception that either the first or second court was misled;" and (iii) it must be found that the party "would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."  *New Hampshire*, 532 U.S. at 750-51 (internal citations

omitted).  As the Supreme Court noted there, "additional considerations may inform the doctrine's application in specific factual contexts."  *Id.* at 751; *see also*, to the same effect, *Zedner v. United States*, 126 S.Ct. 1976 (2006).  In this Circuit, the Court of Appeals has emphasized that the doctrine is limited "to situations where the risk of inconsistent results with its impact on judicial integrity is certain."  *Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138, 148, citing *Simon v. Safelite Glass Corp.*, 128 F.3d 68, 72 (2d Cir. 1997).  A party seeking to apply judicial estoppel must show both that its opponent has taken an inconsistent position and that a court in an earlier proceeding has adopted this position.  *See Uzdavines*, 418 F.3d at 148 (2d Cir. 2005), citing *Stichting v. Schreiber*, 407 F.3d 34, 45 (2d Cir. 2005), *Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004), *Adler v. Pataki*, 185 F.3d 35, 41, n. 3 (2d Cir. 1999).

There is no basis on the facts of this matter to conclude that Oneida took clearly inconsistent positions, or that the Court was misled or made an earlier determination that was plainly inconsistent with the finding that Oneida seeks in this proceeding.  The Debtor's projections at the confirmation hearing were introduced for the purpose of proving feasibility under § 1129(a)(11) of the Bankruptcy Code.  The Court's finding in the Confirmation Order that the Plan was feasible was not predicated on the premise that the Debtor *would* pay the DRA Premiums, only that it *could* pay them and all other expenses that it might conservatively anticipate.  There would be no impact on the integrity of the Confirmation Order by the finding that Oneida now seeks, that the DRA Premiums were discharged "claims."

Nor can it be said that the Court was misled in confirming the Plan if the Debtor's right to challenge the DRA Premiums were also preserved.  The confirmation testimony

involved projections, which always involve contingencies.  In any event, after the

confirmation hearing, the PBGC and the Debtor agreed to a stipulation that finalized a

Settlement Agreement that had been filed earlier but had never been approved.  The

Stipulation, like the earlier Settlement Agreement, expressly reserved both parties' rights

with respect to the status of the DRA Premiums.  The Stipulation provided:

> Nothing contained in this Stipulation, the Disclosure
> Statement (or any supplements thereto), the Plan of
> Reorganization (or any supplements thereto), and the
> Confirmation Order, shall prejudice, preclude or otherwise
> affect any rights, obligations or arguments Oneida or the
> PBGC may have to challenge or enforce the validity of the
> DRA Provision, including, without limitation, the
> requirement to pay the DRA Premiums. (Order, ECF# 443,
> ¶ 5.)

The Court asked for clarification of this language, as the paragraph could be read to mean

that the "Plan" and "Confirmation Order" would not "affect" (or discharge) the DRA

Premiums; this seemed inconsistent with the parties' intentions as stated elsewhere.  This

resulted in the following colloquy:

THE COURT:        So this paragraph, in the PBGC's view, doesn't
                  preclude the debtor from saying, we got a discharge,
                  therefore, we don't have to pay the [Termination
                  Premiums]?

[Counsel for PBGC]: That's correct.  Nor does it preclude the PBGC from
                  taking the position that says this is a post-
                  confirmation obligation.

THE COURT:        Very good.  Okay.  I thought that's exactly what the
                  party's [sic] position was, but I didn't want the
                  language in Paragraph 5, which is otherwise clear,
                  to be possibly misconstrued . . . .

(Transcript of Hearing, dated October 26, 2006, at 10:11 – 11:3.)

The October colloquy establishes that both parties intended to reserve their rights,

as they had earlier.  In all events, Oneida did not gain an unfair advantage on account of

27

the confirmation testimony that the PBGC now quotes out of context.  The PBGC also did not lose any rights, even though the parties, prior to the October hearing, did not underline the fact that the PBGC's agreement to take a $3 million note was subject to the caveat that, if it were successful in this litigation, it would receive the $3 million note plus the DRA Premiums in full.  The estoppel doctrine (usually equitable estoppel) has been applied in appropriate circumstances in Chapter 11 cases when a creditor relies to his detriment on prior representations by a debtor.  Full disclosure and fair treatment are cornerstones of the reorganization process.  *See Momentum Mfg. Corp. v. Employee Creditors Comm.* (*In re Momentum Mfg. Corp.*), 25 F.3d 1132, 1136 (2d Cir. 1994).  However, this Court was not misled in connection with the confirmation hearing testimony.  In light of the October Stipulation, the record could not be clearer that the PBGC was not misled, either.  There is no threat to judicial integrity when neither the parties nor the tribunal is misled.  *See Uzdavines*, 418 F.3d at 148.

## CONCLUSION

The Court finds that the DRA Premiums, created by the Deficit Reduction Act of 2005, are prepetition "claims" that were discharged by the Debtor's Plan of Reorganization and that the Debtor is not estopped from obtaining such a finding.  The Debtor is directed to settle an appropriate order on five days' notice.


Dated: New York, New York
       February 27, 2008

           ___*/s/ Allan L. Gropper*_____
           ALLAN L. GROPPER
           UNITED STATES BANKRUPTCY JUDGE